O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 5:21-CR-00088-ODW |
| Plaintiff, | |
| v. | ORDER DENYING |
| JUAN DE DIOS-ALVAREZ, | MOTION TO DISMISS [38] |
| Defendant. | |

## I.    INTRODUCTION

Pending before the Court is Defendant Juan De Dios-Alvarez's Motion to Dismiss. (Mot. Dismiss ("Motion" or "Mot."), ECF No. 38.)  On July 18, 2023, after oral argument, the Court denied the Motion. (Hr'g Tr. 12:25–13:15, ECF No. 98.)  On February 24, 2025, at the pretrial conference, the Court reopened the Motion for re-argument.  (PTC Mins., ECF No. 95.)  The Court held re-argument on March 3, 2025, and took the Motion under submission.  (Re-Argument Mins., ECF No. 102.) For the reasons below, the Court **DENIES** Alvarez's Motion.

## II.    BACKGROUND

Defendant Alvarez was removed from the United States at least four times, with August 20, 2012, being the last date he was last deported.  (Indictment, ECF No. 17.)

After reentering the United States following the most recent deportation, in January 2013, Alvarez registered a vehicle with the California Department of Motor Vehicles ("DMV").    (Mot., Ex. A ("Records"), ECF No. 42.)    In 2014, Alvarez renewed his commercial driver's license.  (*Id.*)  In February 2014, Alvarez submitted a "Federal Drug Testing Custody and Control Form" to the U.S. Department of Transportation to comply with federal trucking driving regulations.  (*Id.*)

On or about November 2020, ICE Deportation Officer Christopher Barth ("DO Barth") began investigating Alvarez's brother.  (Decl. Elias Valdez ISO Opp'n Mot. ("Valdez Decl.") ¶ 7, ECF No. 43-1.)  During the investigation, DO Barth learned that Alvarez had previously been deported.  (*Id.*)  As a result, DO Barth searched law enforcement databases for Alverez, (*id.*), and discovered that he had renewed his California driver's license, (Compl. ¶ 4a, ECF No. 1).  After an investigation, Alvarez was charged with violation of 8 U.S.C. § 1326, which "criminalizes three acts by aliens who have been deported: (1) entering the United States; (2) attempting to enter; or (3) being 'found in' the United States, all without permission of the Attorney General."  *United States v. Gonzalez-Diaz*, 630 F.3d 1239, 1242 (9th Cir. 2011).

DO Barth does not recall which database he searched, but another deportation officer believes that it "is likely that DO Barth searched EARM, NLETS, and Cal-Photo."  (Valdez Decl. ¶ 7.)  The Enforce Alien Remove Module ("EARM") is an ICE database that includes all encounters between U.S. immigration authorities and illegal immigrants in the U.S., and can be searched by DOs.  (*Id.* ¶ 2.)  The National Law Enforcement Telecommunications System ("NLETS") is an information portal that enables agencies to search state department of motor vehicle records for vehicle registration and driver's license information.  (*Id.* ¶ 3.)  Cal-Photo is a California DMV database that includes identification cards and driver's licenses.  (*Id.* ¶ 4.)

Between 2012 and 2021, these databases did not provide alerts or notices regarding any individuals.  (*Id.* ¶ 5.)  Instead, immigration officials must search them to obtain information about any particular person.  (*Id.*)  ICE has never had a policy of

routinely searching these databases for persons previously removed from the United States.  (*Id.* ¶ 6.)

On May 23, 2023, Alvarez moved to dismiss the Indictment under Federal Rule of Criminal Procedure 12(b) on the basis that the statute of limitations had expired before the Government charged Alvarez.  (Mot.; *see also* Reply, ECF No. 45.)  The Government opposed.  (Opp'n, ECF No. 43.)  On June 26, 2023, the Court held a hearing on the Motion.  (Hr'g Tr.)  During the hearing, the Court denied the Motion. (*Id.* at 12:25–13:15.)  On February 24, 2024, the Court reopened the Motion for argument.  (PTC Mins.)  The parties filed supplemental briefs, and the Court heard argument from both parties on March 3, 2025.  (Suppl. Opp'n, ECF No. 100; Suppl. Mot., ECF No. 101; Re-Argument Mins.)

### III.    LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b) allows a pretrial motion to dismiss an offense "that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  "Generally, Rule 12(b) motions are appropriate to consider such matters as former jeopardy, former conviction, former acquittal, statute of limitations, immunity, and lack of jurisdiction."  *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993) (cleaned up).  In ruling on a Rule 12(b) motion, "the district court is bound by the four corners of the indictment."  *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).  "On a motion to dismiss an indictment for failure to state an offense, the court must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged."  *Id.*

### IV.    DISCUSSION

Alvarez argues that the 2021 Indictment must be dismissed because the five-year statute of limitations began running in 2013 when immigration officials had constructive knowledge of his presence in the United States.  (Mot. 1)  The Government argues that only actual, not constructive, knowledge triggers the statute of limitations, and that the earliest immigration officials had actual knowledge was in

2020.  (Opp'n 2.)  The Government also argues that even if constructive knowledge can trigger the statute of limitations, under the facts of this case, immigration officials did not have constructive knowledge of Alvarez's presence in the United States before 2020.  (*Id.* at 4–5.)  Therefore, according to the Government, the Indictment is timely. (*Id.* at 7.)

As recently as 2019, the Ninth Circuit expressly acknowledged that it has "not yet addressed whether discovery may be based on constructive, as opposed to actual, knowledge." *United States v. Valadez-Munoz*, 773 F. App'x 411, 411 (9th Cir. 2019); *accord United States v. Zamudio*, 787 F.3d 961, 966 (9th Cir. 2015*)* ("[W]e have not addressed whether such discovery and identification must be based on the government's actual knowledge or can instead be proven under a constructive knowledge theory."); *United States v. Diaz-Hinojos*, 724 F. App'x 612, 613 (9th Cir. 2018) (same); *United States v. Ramirez-Nunez*, 765 F. App'x 313, 313 (9th Cir. 2019) (same); *United States v. Mendoza-Moreno*, 774 F. App'x 1029, 1031 (9th Cir. 2019) (same).  Other Circuits are split on this issue.  *United States v. Valadez-Munoz*, No. CR 17-00702-RGK, 2018 WL 11230476, at *2 n.1 (C.D. Cal. Apr. 25, 2018) (recognizing circuit split).

The Court need not wade into this issue because Alvarez's argument fails even under the constructive knowledge approach.  As Alvarez explains, under this approach, the statute of limitations is triggered when "immigration authorities could have, through the exercise of diligence typical of law enforcement authorities, discovered the violation."  (Mot. 5 (quoting *United States v. Gomez*, 38 F.3d 1031, 1035 (8th Cir. 1994))); *see also United States v. Scott*, 447 F.3d 1365, 1368–69 (11th Cir. 2006) ("[W]e hold that an alien is constructively 'found in' the United States when the government either knows of or, 'with the exercise of diligence typical of law enforcement authorities, could have discovered the illegality of the defendant's presence.'"); *Mendoza-Moreno*, 774 F. App'x at 1031 (analyzing whether "immigration officials, with the exercise of reasonable diligence, should have"

discovered the violation). "What constitutes reasonable diligence varies with the facts and circumstances of each case." *Mendoza-Moreno*, 774 F. App'x at 1032 (cleaned up) (quoting *United States v. Palomino Garcia*, 606 F.3d 1317, 1323 (11th Cir. 2010)).

Here, since at least 2013, immigration officials had access to the very database containing DMV records DO Barth later searched in 2020 that alerted the Government to Alvarez's presence in the United States. (Valdez Decl. ¶¶ 6–7.) Thus, Alvarez argues, immigration officials could have discovered his illegal reentry had they exercised diligence typical of law enforcement authorities. (Mot. 8.) Notably, the DMV records DO Barth searched do not indicate that Alvarez was in the United States illegally. Instead, they would simply alert immigration officials to Alvarez's presence in the United States. To determine whether Alvarez illegally reentered the United States, immigration officials would have to cross-reference their information on previously deported persons with records like the DMV database.

This highlights the two relevant components to discovering illegal reentry. First, immigration officials must know that an individual is in the United States. Second, they must know that this individual had previously been deported. This distinction is apparent in the Third Circuit's decision in *United States v. DiSantillo*, 615 F.2d 128 (3d Cir. 1980). There, immigration authorities had actual knowledge of the defendant's entry into the United States—through a recognized port of entry—and the court determined that, "through the exercise of diligence typical of law enforcement authorities," officials "could have" discovered that the defendant had violated the statute (i.e., that his presence in the United States was illegal). *Id.* at 135. In Alvarez's case, finding constructive knowledge would require immigration officials to search accessible databases to determine whether an individual is in the United States (e.g., every person, regardless of immigration status, who renewed their driver's license). Then, immigration officials would be required to cross-reference those databases to determine whether that individual reentered illegally.

Therefore, the question in this case is whether it would be an exercise of diligence typical of law enforcement authorities for immigration officials to compare information in two databases to which they have access without an individual having first been brought to their attention. Put otherwise, should immigration officials be expected to cross-reference their list of deported persons with DMV records to which they had access before being specifically alerted that a deported alien may be in the United States?

There is a categorical difference between cross-referencing databases, including state DMV and federal transportation records, with records of previously deported persons, and doing a targeted, individual search to determine whether a person is in the United States after becoming aware that a specific individual had been deported. This case does not present a circumstance where immigration officials became aware of Alvarez's presence in the United States but did not search his records to determine whether he was in the country unlawfully. In that situation, immigration officials may have had constructive knowledge *once* they become aware Alvarez is in the United States, *but before* they search records to determine whether he was in the country unlawfully. And this is unlike the circumstances in November 2020, where DO Barth conducted a targeted search of DMV records to determine if Alvarez was in the United States *after* being specifically alerted to Alvarez's status as a previously deported individual. As the Court commented at the first hearing on the Motion, requiring a search of all motor vehicle databases without first being altered to a specific person, "would just be god awful, in terms of burdensome. . . . I can't think of a way that that could be done expeditiously. They would have to have a database of everyone who was deported, and then run those names through every state['s] department of motor vehicles . . . looking for a match." (Hr'g Tr. 5:14–21.)

The standard articulated by Alvarez and the Circuits that have adopted the constructive knowledge approach is not simply whether there was "reasonable diligence," but whether there was "diligence typical of law enforcement authorities."

6

*Gomez*, 38 F.3d at 1037; *accord Scott*, 447 F.3d at 1368–69; *DiSantillo*, 615 F.2d at 135. Under this standard, it is dispositive that ICE has never had a policy of routinely searching these databases for persons previously removed from the United States. (Valdez Decl. ¶ 6.) This investigative practice (or affirmative lack thereof), combined with nothing in the record suggesting that immigration officials were or should have been specifically alerted to Alvarez's presence in the country or status as a previously deported individual, counsels in favor of finding that, even under the constructive knowledge approach, the statute of limitations did not begin to run before 2020.

While not binding on this Court, the Ninth Circuit's recent unpublished opinions support this Court's finding of no constructive knowledge here.

In *Valadez-Munoz*, the defendant reentered the United States after being deported, and after returning to the country, renewed his driver's license in 2010 and 2015. *Valadez-Munoz*, 2018 WL 11230476, at *1. The 2015 renewal led the National Crime Analysis and Targeting Center ("NCATC"), a law enforcement center within DHS, to discover his presence in the country. *Id.* Per a declaration submitted by the government in that case, "NCATC receives data sets from various sources, vets the data sets for information appropriate for further review, analyzes that information by searching additional databases, and then provides location information on prospective removable aliens to . . . officials for potential use." *Id.* In 2015, one of NCATC's sources provided it with 250,000 datasets, including the defendant's information. *Id.* NCATC reviewed the datasets and assigned the defendant's data to a criminal targeting specialist for analysis. *Id.* Two years later, in 2017, an NCATC specialist conducted a targeted search and discovered the defendant's 2015 driver's license renewal through the NLETS database. *Id.*

The district court in *Valadez-Munoz* held that the statute of limitations did not begin to run until NCATC received the dataset in 2015 because immigration officials "did not realistically have the means to discover" the defendant until then. *Id.* at *2.

The court rejected the defendant's argument that accrual began with the 2010 license renewal, because this would have required immigration officials "to search the California DMV database for [d]efendant on its own accord." *Id.*  It further stated that it did "not expect immigration authorities to conduct searches in all accessible state databases for any person previously deported on the chance that they might have illegally reentered the county." *Id.*  Thus, the court declined "to find that monitoring the state DMV database is an exercise of typical law enforcement diligence." *Id.*  The Ninth Circuit, in an unpublished opinion, affirmed. *Valadez-Munoz*, 773 F. App'x at 411–12.  The Ninth Circuit agreed that "[t]he record does not suggest that typical law enforcement diligence required NCATC to have acquired or searched this data any sooner." *Id.*

In his Reply, Alvarez attempts to distinguish this case on the basis that the Ninth Circuit's decision relied on the fact that "the government did not have the means to search" the databases until after it received "the data set with his information" in 2015.   (Reply 2 (quoting *Valdez-Munoz*, 773 F. App'x at 412).) While this may be true, the district court recognized that, like in Alvarez's case here, immigration officials technically could have searched California DMV records at any time.   *Valadez-Munoz*, 2018 WL 11230476 at *2 ("The Court does not expect immigration authorities to conduct searches in all *accessible* state databases for any person previously deported on the chance that they might have illegally reentered the country." (emphasis added)).   *Id.*  However, the court nevertheless concluded that such a search would be beyond reasonable diligence. *Id.*  The Ninth Circuit affirmed this reasoning. *Valadez-Munoz*, 773 F. App'x at 411 ("[E]ven assuming constructive knowledge triggers the statute of limitations, the record does not show that the government delayed the investigation or ignored datasets in its possession.").  Under this reasoning, Alvarez's statute of limitations did not begin to run until 2020 at the earliest.

In *United States v. Diaz-Hinojos,* another case affirmed by the Ninth Circuit, the defendant returned to the United States after his deportation. Order, *United States v. Diaz-Hinojos*, No. 9:15-CR-00018-DLC, at 2 (D. Mont. Nov. 20, 2015), aff'd 724 F. App'x 612 (9th Cir. 2018). From the date of reentry, October 2002, until July 2015, with few exceptions, he lived in Nevada. *Id.* In 2011, the defendant recorded the transfer of his father's home to him in the Nevada recorder's office. *Id.* The defendant had a 2006 Nevada driver's license and a 2004 certificate of title for his vehicle. *Id.* He also applied for and received a federal tax identification number and a social security number, and paid federal income taxes. *Id.* at 3. Affirming the district court's finding that the indictment was timely, the Ninth Circuit held that the defendant could not show constructive knowledge because "[t]here is no evidence that immigration authorities were *willfully blind* to information in their possession, or that they *unreasonably refrained* from taking their usual investigative steps." *Diaz-Hinojos*, 724 F. App'x at 613 (emphasis added). While, unlike here, *Diaz-Hinojos* lacked a finding that immigration officials could have searched Nevada's DMV database, the application of the Ninth Circuit's ruling to this case yields the same result as *Valadez-Munoz*—"[t]here is no evidence that immigration authorities were willfully blind to information in their possession, or that they unreasonably refrained from taking their usual investigative steps." *Id.* The evidence in the record here is that "ICE has never had a policy of routinely searching databases, including EARM, NLETS, and Cal-Photo, for aliens who had previously been removed from the United States." (Valdez Decl. ¶ 6.)

Accordingly, the Court finds that, even under the constructive knowledge standard, the statute of limitations did not begin to run until at least November 2020 when DO Barth was alerted to Alvarez's previous deportation.

1

2

## V.    CONCLUSION

3

For the reasons discussed above, the Court **DENIES** Alvarez's Motion to

4

Dismiss.  (ECF No. 38.)  The Pretrial Hearing will be held on **March 11, 2025, at**

5

**2:30 p.m.**, and the Jury Trial will begin on **March 12, 2025, at 9:00 a.m.**  (*See* PTC

6

Mins.)

7

8

**IT IS SO ORDERED.**

9

10

March 5, 2025

11

12

_____

13

**OTIS D. WRIGHT, II**

14

**UNITED STATES DISTRICT JUDGE**

15

16

17

18

19

20

21

22

23

24

25

26

27

28